■ In the Matter of TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, Appellant, v. MAX H. FOLEY et al., Constituting the Board of Standards and Appeals of the City of New York, et al., Respondents, and JACK PARKER et al., Intervenors-Respondents.

APPEAL from an order of the Supreme Court at Special Term, entered June 12, 1962 in New York County, which granted a motion by respondents for an order affirming the action of the Board of Standards and Appeals in directing the issuance of a building permit to intervenors-respondents.

Order entered on June 12, 1962 confirming the action of the Board of Standards and Appeals, affirmed.

VALENTE, J. (dissenting). In this proceeding under article 78 of the Civil Practice Act to review and annul the determination of the Board of Standards and Appeals ("Board") in directing the issuance of a building permit, petitioner, Triborough Bridge and Tunnel Authority ("Triborough") appeals from an order dismissing its petition and confirming the Board's determination.

In June, 1961, the Borough Superintendent of the Department of Buildings (Manhattan) denied the application of the owner of a plot of land on the northerly side of East 36th Street — between Second and Third Avenues — for a building permit. This plot results from the intersection of the northerly side of East 36th Street — between Second and Third Avenues — by the exit roadway of the Queens Midtown Tunnel. Permission was sought to erect a 20-story multiple dwelling on the theory that the plot was a "corner lot". A permit was denied because the site could not qualify as a corner lot unless a permanent easement of light and ventilation over the Tunnel exit roadway were first obtained from Triborough. In my view of this case, even with the granting of such an easement, this property cannot be considered a corner lot within the intendment of the Multiple Dwelling Law so as to permit the erection of the proposed building.

The lot involved is an irregular plot of land having a frontage on the northerly side of East 36th Street of approximately 166 feet. The entire westerly, northwesterly and northerly boundary forms a sweeping curve extending about 217 feet along a concrete retaining wall, erected and maintained by Triborough, which separates the premises from the exit roadway of the Tunnel. That roadway provides egress for vehicular traffic originating in Queens.

The premises involved herein were part of the property acquired by Triborough in 1939 for the construction of the Queens Midtown Tunnel following condemnation by the City of New York. Title was taken by Triborough in "fee simple absolute, free from all liens and encumbrances and any and all rights, terms, interests, privileges, franchises and easements whether of owners, abutters or others". In 1949, about 10 years after the Tunnel was built, Triborough, finding that it no longer needed the premises here involved, sold the unneeded land to the present owners' predecessor in title for $32,000. No easement of light, air or access over and to the Tunnel or its roadway was granted in the deed conveying title to the premises.

The building plans filed by the owners in April, 1961, did not include any provision for court or yard space on the premises along the curved exit roadway, but instead proposed to have windows open directly thereon. Under subdivision 2 of section 30 of the Multiple Dwelling Law, insofar as applicable herein, every room must have "at least one window opening directly upon a street or upon a lawful yard, court or space above a setback upon the same lot as that occupied by the multiple dwelling". The plans were predicated, therefore, on the assumption that the Tunnel exit roadway was a "street" within the meaning of subdivision 2 of section 30 of the Multiple Dwelling Law.

Moreover, the plans purported to take advantage of the increased building rights accruing to owners of "corner lots". A building erected on a "corner lot" can be of a greater height and bulk than if an interior lot is used; and there is also a relaxation in such cases in the usual requirements of law for rear yards and courts.

Section 4 (subd. 31, par. a) of the Multiple Dwelling Law defines a corner lot as: "a lot of which at least two adjacent sides abut for their full length upon streets or public places not less than forty feet in width."

Following the denial of the application for a permit by the Department of Buildings, the owners sought unsuccessfully to obtain from Triborough an easement of light and air over the exit roadway; and thereupon appealed to the Board. The Board determined that the Superintendent of Buildings had no power to require the owners to obtain an easement from Triborough and that the exit roadway constituted a "street" or "public place" within the meaning of the Multiple Dwelling Law which would qualify the premises as a "corner lot". Special Term concurred in the view that the exit roadway was a "street" and a "public place" as those terms are used in section 4 (subd. 31, par. a) of the Multiple Dwelling Law and consequently that the Board had correctly determined that the subject premises constituted a "corner lot".

I must dissent from the affirmance of that conclusion. The exit roadway of the Queens Midtown Tunnel cannot properly qualify as a "street" or "public place" within the meaning of those terms in the Multiple Dwelling Law, because that roadway, unlike a city street or other public place, does not satisfy the minimum requirements of assured light and air for adjacent owners.

Owners of land abutting upon a public street have an easement of light, air and access, which cannot be taken away except by payment of compensation (see *Lahr* v. *Metropolitan El. Ry. Co.,* 104 N. Y. 268, 291; *Matter of Mayor, etc., of New York,* 186 N. Y. 237, 244). It is these easements of light, air and access which justify the provisions of the Multiple Dwelling Law permitting builders to erect structures with windows opening directly upon a street, and according to owners of corner lots greater building rights.

But unlike a city street, no such easements of light, air and access exist with respect to the Tunnel exit roadway. Primarily, the Tunnel and exit roadway were acquired by Triborough in fee simple absolute free of all easements, whether of owners, abutters or others. When, however, property is taken for street purposes, the rights of abutters are not extinguished. Thus, there is a significant distinction between the acquisition of title in fee simple absolute and the taking of lands in trust for street purposes (see *Matter of City of New York,* 174 N. Y. 26, 35).

Again, unlike city streets which are held in trust and whose use and disposition are accordingly limited (see *Peterson* v. *City of New York,* 260 N. Y. 156, 157; New York City Charter, §§ 383, 384), there is no such restriction imposed on Triborough in the exercise of its dominion over its projects. Triborough may, under section 533 of the Public Authorities Law, completely occupy the roadways providing access to its projects. It can erect buildings on or over the roadways, and may also discontinue or close an existing roadway and utilize the space for any building or other facility. These powers can be exercised without resorting to any street closing proceedings. So, too, if Triborough were to build an elevated structure over its properties, it would not be obliged to compensate abutting owners for the deprivation of light and air.

In principle, *Morelite Serv. Stations* v. *Goldman* (261 N. Y. 32) is indistinguishable from the instant case and its rationale should be followed here. In that case the City of New York had acquired by condemnation a strip of land for use as one of the Brooklyn approaches to the Williamsburg Bridge. This land was later denominated as "New street". In connection with the right of access of an abutting owner, the Court of Appeals ruled that "New street", despite its name, was not a "street", and that abutting owners thereon did not have the usual easements of light, air or access enjoyed by owners fronting on public streets. The court, per O'BRIEN, J., there said (pp. 35–36): "That this

thoroughfare, generically, is a highway cannot be successfully disputed. It is public in character and all who travel to or from the Williamsburg Bridge possess ·a right of passage over it. In that broad sense its nature does not essentially differ from a mountain trail, a railroad or a city street. (*Sun P. & P. Assn.* v. *Mayor,* 152 N. Y. 257, 265.) Although it bears all the physical resemblance to a street, its status in a specific legal sense may be radically dissimilar. Many elements, among them the purpose of its acquisition, the nature of the municipal title, the power and the identity of the official vested with administration over it, the residue of interest lingering in the title of the abutting owner, all these factors may tend to mark a divergence from the legal condition of a street. This land, notwithstanding its inclusion in the nomenclature of streets and its physical appearance, was not acquired for street purposes, nor was it laid out as such. It has never been under the control of those municipal officers who have the management of streets. It does not appear upon the map or plan of the city as a street. Neither the Commissioner of Bridges nor his successor, the Commissioner of Plant and Structures, possessed authority, even if there were any evidence of an intention by them, to fix the status of this passageway as that of a street. Always, since its acquisition for bridge purposes, it has constituted bridge property and nothing else. Plaintiffs have not shown that such easements of light, air or access as usually inhere in the title of abutting owners on a street attach to these plaintiffs. The lots of which these remnants formed untaken parts never had access to any street except South Fifth street. Until after the taking of parts of these lots, New street did not exist."

All of the factors which the Court of Appeals referred to as distinguishing the bridge approach from a " street " are present in the instant case. Thus, the Tunnel property, since its acquisition, has constituted Tunnel property and nothing else; title was taken in fee simple absolute and not for street purposes; the exit roadway has not been under control of the several Borough Presidents of the City of New York who are vested with management and control of city streets (New York City Charter, § 82, subd. d) and they have no supervisory powers over the roadway; no residue of interest was left in abutting owners since the exit roadway was acquired by a condemnation which expressly cut off all rights of abutting owners, including easements of light, air and access; and the exit roadway is not designated on the map or plan of the city as a " street ".

Special Term's attempt to distinguish *Morelite* seems ineffectual. No distinction can be made in determining whether the exit roadway is a " street " between the rights of abutting owners to access and the easements of light and air. The Court of Appeals made no such distinction. If the exit roadway is no " street " for the purposes of access or other easements, it is no " street " for the purpose of determining the height of a building to be erected upon an abutting site. A fortiori, any attempted grant by Triborough of an easement of light and air could not qualify it as a street.

Finally, the holding by Special Term that the exit roadway is a " public place " within the meaning of section 4 (subd. 31, par. a) of the Multiple Dwelling Law cannot be sustained. It should first be noted that the words " public place " do not appear in subdivision 2 of section 30 of the Multiple Dwelling Law. Hence, the question is solely relevant on the right of the owner to take advantage of the additional privileges given to owners of " corner lots ". Since the exit roadway is not a " street ", that in itself would require a reversal of Special Term and an annulment of the determination of the Board. The meaning of the term " public place " must properly be determined in the light of the purposes of the statute in which the term is used. Special Term considered that purpose to be the insurance of adequate light and air for windows

of multiple dwellings. Hence, the words must be construed to refer to an open area, held in trust for the public use, which affords to abutting property owners a basic guarantee that their light, air and view will not be curtailed. Since it has been shown hereinabove that the exit roadway offers no such assurance of light and air it may not be considered as a "public place" as that term is used in the Multiple Dwelling Law.

I would therefore reverse the order of Special Term and grant petitioner's application to annul the determination of the Board.

Breitel, J. P., McNally and Eager, JJ., concur in decision; Valente, J., dissents in opinion in which Rabin, J., concurs.

Order entered on June 12, 1962, confirming the action of the Board of Standards and Appeals, affirmed, with $20 costs and disbursements to respondents, on the opinion of Mr. Justice Hecht at Special Term. All concur except Rabin and Valente, JJ., who dissent in opinion by Valente, J. [34 Misc 2d 870.]